[725 NYS2d 327]

In the Matter of PHILIP LEE (Admitted as PHILIP L. K. LEE), a Suspended Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, May 29, 2001

## APPEARANCES OF COUNSEL

*Sarah Jo Hamilton* of counsel (*Thomas J. Cahill,* attorney), for petitioner.

*Philip Lee,* respondent *pro se.*

## OPINION OF THE COURT

Per Curiam.

Respondent Philip Lee was admitted to the practice of law in the State of New York as Philip L. K. Lee by the First Judicial Department on February 14, 1978. Respondent was also admitted to the practice of law in the District of Columbia as Philip L. K. Lee on December 18, 1978, and there is no indication that he has maintained an office for the practice of law in New York.

On or about August 8, 1996, respondent pleaded guilty in the United States District Court for the Northern District of Georgia, Atlanta Division, to one count of conspiring to conceal the nature of monetary transactions of property derived from unlawful activity in violation of 18 USC § 1956 (h), a felony under the United States Code.[1] The criminal information alleged that respondent was involved in a conspiracy to conceal drug money, which also involved "current and/or former officials of organizations known as the Hip Sing Tong Association and the Hung Mun Association." Respondent was sentenced on January 7, 1997 to: 15 months imprisonment; three years of supervised release, including 200 hours of community service; a special assessment of $50; and restitution to the United States in the amount of $22,400.

By decision and order entered October 21, 1997 (*Matter of Lee,* 235 AD2d 110), this Court granted the Departmental Disciplinary Committee's (the Committee) petition seeking an order determining that the crime of which respondent had been convicted constituted a "serious crime" as defined by Judiciary Law § 90 (4) (d), suspended respondent from the practice of law pursuant to Judiciary Law § 90 (4) (f), and directed him to show cause before the Committee why a final order of censure, suspension or disbarment should not be entered.

---

1. This Court has held that the elements of the Federal money-laundering statutes are not sufficiently similar to New York's money-laundering statute (Penal Law § 470.10) to trigger the automatic disbarment provisions of Judiciary Law § 90 (4) (a) (*see, Matter of Weinig,* 220 AD2d 184; *Matter of Stern,* 205 AD2d 162).

Pursuant to this Court's order, a Hearing Panel (the Panel) convened, and a hearing was held on October 7, 1998, at which time respondent appeared *pro se* and testified on his own behalf. In a report dated April 13, 2000, the Panel recommended that respondent be suspended for three years nunc pro tunc to his initial suspension, or the length of his supervised release, whichever was longer. The Committee moved for an order, pursuant to 22 NYCRR 603.4 (d) and 605.15 (e) (2), confirming the findings of fact and conclusions of law set forth in the report of the Panel. Respondent did not interpose a response and while that motion was pending, the District of Columbia issued an order disbarring respondent.[2] As a result of the District of Columbia's disbarment, and after a review of the record, this Court remanded the matter to the Panel in order to reconsider the recommended sanction. The Panel subsequently adhered to its prior recommendation, and the Committee now moves to confirm.

The underlying facts of this matter are not in dispute. Respondent developed a law practice consisting primarily of contract and immigration law, which included numerous transactions involving the sale of restaurants within the Chinese community. On May 25, 1995, respondent proceeded to a hotel room to borrow $30,000 from a Leonard Grossman, whom he did not know, on behalf of his client, a restaurant owner who purportedly was unable to obtain a bank loan due to a prior bankruptcy filing. Grossman, however, was a cooperating witness for the Federal Bureau of Investigation (FBI), which was conducting an investigation into illegal money laundering activities by two known Asian "Fraternal organizations."

The transaction in the hotel room was captured on videotape, at the beginning of which Grossman explains that he knows people in South America who were in a "drug cartel" and that his role is to simply launder money through loans. Grossman goes on to state that:

> "And after I retired from the practice of law, all they do for me now is they give me some cash, and my whole job is, it's really pretty simple. I loan the money out and my main purpose is to convert it into check form. So it isn't that important to me how much interest I make. It isn't so much, but it's

---

2. By order dated January 19, 2001, respondent was disbarred from practice before the United States Tax Court.

important to me to make careful loans. So that the money is laundered back to check point[3] so I can put it into my checking account. So that's my only concern."

Grossman made additional remarks about his South American friends, their drug dealing activities and money laundering, but the Panel, apparently after reviewing the videotape, agreed with respondent that he was distracted on the phone and did not hear the latter comments that Grossman had made to a Mr. Tan, a former real estate partner of respondent's, who had arranged the meeting with Grossman. Later during the transaction, while Tan and respondent were counting the $30,000 "loan," Grossman referred to the fact that the money consisted of one hundred dollar bills because "they" sell only to distributors and "they get their money and it's always been big bills." Tan and Grossman then discussed a television story about "Columbians" involved in a big "drug bust."

Respondent, after accepting the $30,000 in cash from Grossman, forwarded checks to Grossman, by mail, on six different occasions as partial repayment of the loan. A criminal information ensued, and respondent was charged with, and pleaded guilty to, conspiring to engage in a monetary transaction in property believed to be derived from illegal drug trafficking.

Respondent testified at the initial disciplinary hearing that he was not familiar with the term or concept of money laundering at the time of the meeting with Grossman, an assertion which, in our view, borders on the incredible, but the Panel found that there were "sufficient unusual aspects of the transaction that it likely put respondent on notice that it was not above-board." By way of example: Grossman made it clear that his principal purpose was to give out cash and secure checks in return; Grossman told Tan that he would lend him $20,000 and only require him to repay $17,000, with interest, because he did not want to go through the airport with so much cash; and Grossman suggested that respondent borrow the money himself, at a low interest rate, with no collateral, and he would not have to begin payments for two years. Respondent did concede at the hearing that he thought the cash was the product of illegal gambling.

The Panel noted, with regard to mitigation, that respondent had no disciplinary history, without taking note of the ongoing

---

**3.** A viewing of the videotape reveals that Grossman actually stated "check form."

disciplinary proceeding in the District of Columbia, and had submitted four character letters on his behalf. The Panel also acknowledged that early in the meeting, Grossman made a "passing reference" to the fact that he represented people in South America in a drug cartel, but then pointed out that respondent was on the phone when Grossman made several more references to working for drug dealers. The Panel recommended a three-year suspension dating back to respondent's interim suspension, or the length of his supervised release, whichever was longer.

The Committee subsequently moved for an order, pursuant to 22 NYCRR 603.4 (d) and 605.15 (e), confirming the findings of fact and conclusions of law in the Panel's report, and recommending that respondent be suspended for three years, nunc pro tunc to October 21, 1997, or the length of the supervised release, whichever is longer. While that motion was pending, this Court was informed by the Committee that respondent had been disbarred from the practice of law in the District of Columbia by the District of Columbia Court of Appeals, in a decision dated July 13, 2000. That decision adopted a report from the Board of Professional Responsibility, which accepted a Hearing Committee's determination that respondent's crime, on its facts, involved moral turpitude within the meaning of the District of Columbia's code, that money laundering is "an integral part of the stream of commerce in illegal drugs," and that respondent's involvement was egregious. The Board also rejected respondent's claim that he did not know what he was doing and was merely trying to obtain a loan for a client with poor credit history, citing to respondent's guilty plea, in which he specifically asserted that he believed the money to be derived from unlawful drug activity.

This Court, by decision and order dated September 21, 2000 (275 AD2d 643), denied the Committee's motion to confirm, with leave to renew, upon the Hearing Panel's reconsideration of the matter, including the "import of the District of Columbia's disbarment, as well as any other translations or documents added to the record." The Committee, by motion dated January 25, 2001, now seeks to confirm the findings of fact, conclusions of law and recommendation as to the proper sanction following the Panel's reconsideration of the sanction pursuant to this Court's order.

In its report, the Panel agreed with the Committee that this case warrants a departure from the general policy of reciprocal discipline in that this matter proceeded independently of the

District of Columbia proceeding and that the Panel, relying on the same evidence as in the District of Columbia proceeding, found respondent to be credible. The Panel specifically refers to the videotape of the illicit transaction and maintains that although the District of Columbia Board of Professional Responsibility "emphatically agreed" with the District of Columbia Hearing Committee that respondent's testimony that he was not paying attention when the source of the money was mentioned was not credible, the Panel here found that "it is apparent from the videotape that Respondent is not listening to the conversation between Grossman and Tan."

Notwithstanding the Panel's conclusion that respondent did not hear Grossman's comments to Tan regarding Grossman's South American friends and illegal narcotics transactions, it must be pointed out that before Tan arrived, Grossman explained to respondent that he had represented people in South America in a drug cartel when he was a lawyer, but now they give him cash, which he converts into check form. The latter conversation was acknowledged by the Panel in its first report, but not its subsequent report. In any event, it is clear that respondent was made aware of the source of the money, thereby eliminating one of the mitigating factors relied upon by the Panel.

A thorough review of the videotape also leads us to disagree with the Panel and conclude, as did the Board of Professional Responsibility in the District of Columbia, that respondent was not, in fact, distracted on the phone, was not engaged in a telephonic conversation, and was well within hearing range of the discussion regarding South American drug cartels and money laundering which was ongoing between Grossman and Tan. Moreover, respondent, at his plea allocution, acknowledged that he was told the money was from South American drug dealers and, in another part of the colloquy, answered in the affirmative when asked if he harbored suspicions that the loan was "drug money."

The remainder of the videotape portrays respondent participating in, or simply present for, a number of discussions, variably, with Grossman and/or Tan regarding a remarkable array of criminal activity, including gambling, prostitution, the sale of visas in foreign countries through paid contacts in United States embassies, sham marriages, campaign contributions made in exchange for confidential government information, and the setting up of Chinese restaurants with more than one set of financial records in order to avoid tax liabilities and maximize profits.

We are aware that respondent's involvement in drug trafficking did not extend to the possession or distribution of any controlled substances. Nonetheless, we find respondent's conduct shocking and reprehensible in that he knowingly and willingly participated in what was described by the FBI informant as a vast conspiracy involving the distribution of illegal narcotics, even if only in the financial aspects of it. The foregoing is compounded by respondent's apparent participation in other illegal activities, including, at the very least, the sale of United States visas through contacts in American embassies throughout South America. We conclude, therefore, that respondent's conduct was sufficiently egregious so as to warrant the ultimate sanction of disbarment. (*See,* Code of Professional Responsibility DR 1-102 [a] [3] [22 NYCRR 1200.3] [illegal conduct that adversely reflects on the lawyer's honesty, trustworthiness or fitness as a lawyer], [4] [conduct involving dishonesty, fraud, deceit or misrepresentations], [7] [conduct that adversely reflects on fitness to practice law]; *see also, Matter of Rosa,* 240 AD2d 42; *Matter of Hodge,* 116 AD2d 844, *lv denied* 68 NY2d 606).

Accordingly, the Committee's motion should be granted to the extent that the Panel's findings of fact and conclusions of law, to the extent set forth herein, are confirmed, the Panel's recommendation as to the appropriate sanction is rejected, respondent is disbarred, and his name shall be stricken from the roll of attorneys authorized to practice law in this State.

SULLIVAN, P. J., NARDELLI, WILLIAMS, RUBIN and BUCKLEY, JJ., concur.

Respondent disbarred, and his name stricken from the roll of attorneys and counselors-at-law in the State of New York, effective the date hereof, as indicated.